UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

VS.                                                                        CASE NO: 2:13-cr-96-FtM-38CM

BRIAN ROBERT HARLING

_____/

### OPINION AND ORDER[1]

This matter comes before the Court on the Defendant Brian Robert Harling's Motion to Suppress ([Doc. #29](Doc. #29)) filed on November 8, 2013.  United States Magistrate Judge Carol Mirando held an evidentiary hearing on the Motion on February 19 and 20, 2014.  Harling filed a supplement brief on April 4, 2014, ([Doc. #66](Doc. #66)) and the Government filed a supplemental brief ([Doc. #72](Doc. #72)) on April 21, 2014.  The Magistrate Judge issued a Report and Recommendation ([Doc. #74](Doc. #74)) on April 29, 2014.  Defendant Brian Robert Harling filed Objections to the Report and Recommendation ([Doc. #82](Doc. #82)) on June 6, 2014.  The Government filed its Response ([Doc. #88](Doc. #88)) on June 20, 2014.  Finally, Harling filed a Second Supplemental Brief ([Doc. #90](Doc. #90)) on July 18, 2014.  The issues are now fully briefed and ripe for this Court's review.

---

[1] Disclaimer: Documents filed in CM/ECF may contain hyperlinks to other documents or Web sites.  These hyperlinks are provided only for users' convenience.  Users are cautioned that hyperlinked documents in CM/ECF are subject to PACER fees.  By allowing hyperlinks to other Web sites, this court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.

## STANDARD OF REVIEW

After conducting a careful and complete review of the findings and recommendations, a district judge may accept, reject or modify the magistrate judge's report and recommendation. 28 U.S.C. § 636(b)(1); United States v. Powell, 628 F.3d 1254, 1256 (11th Cir. 2010). A district judge "shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C); see also United States v. Farias-Gonzalez, 556 F.3d 1181, 1184 n.1 (11th Cir. 2009). This requires the district judge "give fresh consideration to those issues to which specific objection has been made by a party." United States v. Derisma, No. 2:09-cr-64-FtM-29SPC, 2012 WL 749405, at *1 (M.D. Fla. Mar. 8, 2012) (quoting Jeffrey S. v. State Bd. of Educ. of Ga., 896 F.2d 507, 512 (11th Cir. 1990) (citing H.R. 1609, 94th Cong., § 2 (1976))). The district judge reviews legal conclusions *de novo*, even in the absence of an objection. See Derisma, 2012 WL 749405, at *1 (citing Cooper-Houston v. S. Ry. Co., 37 F.3d 603, 604 (11th Cir.1994)). A district court may not reject the credibility determinations of a magistrate judge without personally rehearing disputed testimony from the witness. Powell, 628 F.3d at 1256-58.

## DISCUSSION

Defendant Harling objects to the Magistrate Judge's Report and Recommendation arguing the Magistrate Judge erred in determining the credibility of witnesses, in particular the testimony of Ada Dunwody (AD), Nicole Dunwody (ND), and Officer Zammit (Ofc. Zammit). Harling argues the Magistrate Judge improperly applied the law to the scope of the private citizen search of the thumb drives. That is, Harling argues all three search warrants were illegal based upon the initial USB search warrant affidavit because the

2

search was based upon inaccurate information.  Moreover, Harling argues his statements should be suppressed.

      (1) Credibility of Witnesses

Defendant Harling argues the Magistrate Judge erred in her credibility determinations and applied erroneous facts to the law in making her recommendations to the District Court.  Harling suggests the standard to assess the credibility of witnesses should be the same as used in the Eleventh Circuit Court of Appeals pattern jury instructions.  The Eleventh Circuit's pattern jury instruction for determining the credibility of a witness has seven factors to consider.  These factors are:

> Did the witness impress you as one who was telling the truth?
> Did the witness have any reason not to tell the truth?
> Did the witness have a personal interest in the outcome of the case?
> Did the witness seem to have a good memory?
> Did the witness have the opportunity and ability to accurately observe things he or she testified about?
> Did the witness appear to understand the questions clearly and answer them directly?
> Did the witness's testimony differ from other testimony or other evidence?

Contrary to the Harling's suggestion, the Eleventh Circuit has a credibility standard to use when assessing the credibility of a witness.  The Eleventh Circuit's credibility standard states:

> when weighing the credibility of witnesses the Court does not look at the status of the witness, but rather the Court must weigh the testimonies of all the witnesses, the consistencies or inconsistencies in their testimonies, their demeanor on the stand and the witnesses' interest in the outcome of the hearing.

[United States v. Ramirez-Chilel](), 289 F.3d 744, 749-50 (11th Cir. 2002).

In this instance, the Magistrate Judge looked at the demeanor of each witness on the stand and weighed their testimonies, reviewing both consistent and inconsistent

statements. The Magistrate Judge found the testimonies of AD, ND and Ofc. Zammit, in particular, to be credible. This Court will not overrule the recommendation of the Magistrate Judge who observed the witnesses during the hearing and made a proper credibility analysis. See Powell, 628 F.3d at 1256-58. Therefore, after a careful review of the transcript and record before the Court, the Court fully agrees with the Magistrate Judge's credibility determinations and findings of fact. The Court adopts and incorporates the facts in this Opinion and Order.

(2) <u>Whether Officers Exceeded the Scope of the Private USB Search</u>

There are five USB thumb drives at issue in this action. The first two were reviewed by AD and ND. The third thumb drive contained the coded eraser program and was reviewed or opened by AD. The last two thumb drives were located by Ofc. Zammit in the condo rented by ND.

*(a) <u>The First Two USB Thumb Drives</u>*

On July 4, 2013, ND bumped the interior door frame of the hall closet with a large drawing pad, causing three USB thumb drives (Gov't. Ex. 9. 10. and 11) to fall from above the interior door frame. (Doc. #61, pp. 49-50). ND brought the thumb drives to the home of her mother, AD, and the two reviewed their contents. (Doc. #61, pp. 53-57). ND testified at the hearing that she initially saw approximately 30 thumbnails, but when AD scrolled down there were "a ton more." (Doc. #61, p. 56). ND stated the thumbnails were large enough for her to see the photos were of a naked child in different poses on a bed. (Doc. #61, p. 55). ND walked away from the computer while AD continued to review the thumb drives. (Doc. #61, pp. 56-57).

4

AD inserted the second thumb drive into her computer and viewed additional thumbnails of what she described as sexually explicit images of children. (Doc. #61, p. 129). AD testified the children she viewed in the images were "young children," noting "[i]t wasn't preteens" and they did not appear to have reached puberty, and that the pictures appeared to be sexually explicit in nature, not natural images of children. (Doc. #61, p.130). AD also opened one movie file to see if she recognized the adult—trying to determine if Harling was in the video—but upon discovering the man was only visible from the waist down, she immediately closed the file. (Doc. #61, p. 130).

Although the Fourth Amendment prohibits unreasonable searches and seizures by law enforcement officials, the Supreme Court has "consistently construed this protection as proscribing only governmental action; it is wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official." United States v. Jacobsen, 466 U.S. 109, 114, 104 S. Ct. 1652, 80 L. Ed.2d 85 (1984) (citation and internal quotation marks omitted). "A search by a private person does not implicate the Fourth Amendment unless he acts as an instrument or agent of the government." United States v. Steiger, 318 F.3d 1039, 1045 (11th Cir. 2003). It is undisputed that AD and ND are private persons who were not government agents or instruments in this case. What they did with the USB thumb drives in this case did not violate the Fourth Amendment, even if their searches constituted an invasion of Harling's privacy. See Jacobsen, 466 U.S. at 113; United States v. Hyatt, 383 F. App'x 900, 906 (11th Cir. 2010). Thus, in regards to the first two thumb drives, Harling's privacy interest in the images viewed by AD and ND was eliminated by their private party search. See United States v.

Durley, 436 Fed. Appx. 966, 968 (11th Cir. 2011) (holding the defendant lost his privacy interest in the thumb drives he left in a publicly shared computer).

Nevertheless, the Supreme Court has held that an individual can retain a legitimate expectation of privacy after a private individual conducts a search. The Court clarified in Jacobsen that "additional invasions of [an individual's] privacy by the Government agent must be tested by the degree to which they exceeded the scope of the private search." 466 U.S. at 115. After AD and ND viewed the thumb drives, ND called the police and then, AD and ND drove to the condominium ND rented from Harling and met with Ofc. Zammit. ND gave Ofc. Zammit the three thumb drives and reported what AD and ND saw. Ofc. Zammit took the thumb drives to the Fort Myers Police Station and viewed images and video on the thumb drives with Sgt. Doro. Additionally, Det. Meeks, and Det. Wagner also viewed the three thumb drives given to Ofc. Zammit by ND.

Harling argues Ofc. Zammit, Sgt. Doro, Det. Meeks, and Det. Wagner exceeded the scope of the private party search by examining more thumbnail images and videos on the thumb drives than AD and ND did during their private examination. Therefore, the additional viewing by Ocf. Zammit and other officers must be tested by the degree to which they exceeded the scope of the private search. Id.

Contrary to Harling's argument, an officer's viewing of what a private party has freely made available for inspection does not violate the Fourth Amendment. Jacobsen, 466 U.S. at 119. Therefore, officers may take a deeper and more thorough look into the thumb drives than the private parties without violating the Fourth Amendment. United States v. Runyan, 275 F. 3d 449, 464-65 (5th Cir. 2001) (holding that the police do not exceed the scope of the private search when they examine more items within a closed

container than did the private searchers). Thus, merely because Ofc. Zammit and others viewed more images on the thumb drives than AD and ND does not mean they violated the Fourth Amendment because, under [Jacobson](Jacobson), officers may take a deeper look into the thumb drives than the private party search without violating the Fourth Amendment.

Based on the testimony presented at the hearing, it is clear the private party exception applies to the first two thumb drives and no Fourth Amendment violation exists.

### (b) *The Third Thumb Drive*

Harling argues the private party exception does not apply to the third thumb drive because neither AD nor ND saw any child pornography on the third thumb drive. Harling argues, therefore, any pre-warrant viewing of images on the third thumb drive violates his Fourth Amendment rights.

ND acknowledges she did not look at any materials on the third thumb drive. Although AD opened the third thumb drive, she did not view any images on the third thumb drive either. Instead, AD testified she found a coded program that she believed was trying to put something on her computer. AD testified she did not proceed any further on that thumb drive or hit any "buttons" because she did not want anything to be placed on her computer. ([Doc. #61](Doc. #61), pp. 135, 140).

All three thumb drives were presented to Ofc. Zammit in a single baggy when he met AD and ND at the condo ND rented from Harling. At that time, ND informed Ofc. Zammit that she had viewed child pornography on all three thumb drives. By the time Ofc. Zammit received the three thumb drives, Harling's privacy interest in the thumb drives had been compromised by the private citizens, AD and ND.

As noted in Runyan, police do not exceed the private search when they examine more items within a closed container than did the private searchers. 275 F. 3d at 464-65. Although the Supreme Court has long recognized that individuals have an expectation of privacy in closed containers, see, e.g., Smith v. Ohio, 494 U.S. 541, 542, 110 S.Ct. 1288, 108 L.Ed.2d 464 (1990) (per curiam); United States v. Ross, 456 U.S. 798, 822, 102 S. Ct. 2157, 72 L. Ed. 2d 572, (1982), an individual's expectation of privacy in the contents of a container has already been compromised if that container was opened and examined by private searchers, see, e.g., Jacobsen, 466 U.S. at 119, 104 S. Ct. 1652. Thus, the police do not engage in a new "search" for Fourth Amendment purposes each time they examine a particular item found within the container. Runyan, 275 F. 3d at 464-65.

In regards to the third thumb drive, Ofc. Zammit went no further than AD or ND in examining the contents. He did so with the good faith understanding that ND and/or AD had viewed illicit child pornography on all three thumb drives. The Runyan Court stated "the police exceed the scope of a prior private search when they examine a closed container that was not opened by the private searchers unless the police are already substantially certain of what is inside that container based on the statements of the private searchers, their replication of the private search, and their expertise." 275 F. 3d at 463. Given the first three thumb drives were found in the same place, at the same time, and ND informed Ofc. Zammit that she saw illicit pictures on all three thumb drives, Ofc. Zammit could reasonably conclude that Harling's expectation of privacy in the third thumb drive was already frustrated by the private citizen search.

In any event, it is not a violation of the Fourth Amendment if an officer looks further into a package than the private party. Id. at 464 (holding the police do not exceed the

8

scope of the private party search when they examine more items within a closed container than did the private searchers). The Runyan Court held that just because the police viewed more on the disk at issue, in that case, than the private searchers viewed, they did not violate the Fourth Amendment. See Rann v Atchison, 689 F. 3d 832, 837 (7th Cir. 2012) (adopting the holding in Runyan 275 F.3d at 462-64)); United States v. Simpson, 904 F.2d 607, 610 (11th Cir. 1990) (government agents' "search of the box and videotapes did not exceed the scope of the prior private searches for Fourth Amendment purposes simply because they took more time and were more thorough" than the private parties). Therefore, Ofc. Zammit and Sgt. Doro's viewing of the child pornography on the third thumb drive did not violate the Fourth Amendment.

Moreover, there is a single package exception to the Fourth Amendment. In United States v. Garcia-Bercovich, the Eleventh Circuit held that officers did not violate the Fourth Amendment when they opened multiple boxes containing marijuana after just one box on the shipping pallet had been opened by a private party. 582 F. 3d 1234, 1238 (11th Cir. 2009). In Garcia-Bercovich, employees from the shipping company CTI opened a single box taken off a pallet containing multiple boxes. The employees found marijuana in the box and called the police. The police opened the other boxes on the pallet and discovered that they also contained marijuana. Id. The defendant in Garcia-Bercovich, argued that the officers needed a search warrant for each of the additional boxes not opened by the CTI employees. Id. In upholding the decision of the district court, the Eleventh Circuit held that once the initial box was opened, the other boxes on the pallet could also be searched because they were part of the same package. Id.

9

Here, Ofc. Zammit received all three USB thumb drives in a single baggie from ND. All three thumb drives were found in the same location at the same time by ND, and all three were opened and examined to some extent by ND and/or AD. ([Doc. #61](Doc. #61), pp. 69, 88). Thus, the officers did not violate Harling's Fourth Amendment rights by examining the third USB thumb drive for illicit child photos as all three thumb drives had already been opened to some extent by private parties.

### (c) *The Fourth and Fifth USB Thumb Drives*

Harling argues the fourth and fifth USB thumb drives should be suppressed because Ofc. Zammit, Sgt. Doro, Det. Meeks, and Det. Wagner viewed the contents of the thumb drives without a search warrant or prior view by a private party and therefore violated his Fourth Amendment rights.

The Court has determined the reviews of the first, second and third thumb drives did not violate Defendant's rights under the Fourth Amendment. The remaining question is whether the warrantless search by the officers of the fourth and fifth USB drives triggered the protections of the Fourth Amendment. It is a "most basic constitutional rule ... that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment-subject only to a few specifically established and well delineated exceptions.'" [Coolidge v. New Hampshire, 403 U.S. 443, 454–55, 91 S. Ct. 2022, 29 L.Ed.2d 564 (1971)](#) (quoting [Katz v. United States, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L.Ed.2d 576 (1967)](#)). Warrantless searches are thus presumptively unreasonable. [Kyllo v. United States, 533 U.S. 27, 31, 121 S. Ct. 2038, 150 L. Ed.2d 94 (2001)](#).

The fourth and fifth thumb drives (Gov't. Ex. 12 and 13) were found in the closet in Harling's condominium in the same location ND found the other three thumb drives. ND testified she showed Ofc. Zammit where in the closet she had located the first three thumb drives. Upon looking inside the closet, Ofc. Zammit observed two additional USB thumb drives "located up on the overhang for baseboards" and visible to the naked eye. (Doc. #61, p.156); (Gov't Ex. 5H).

After recovering the fourth and fifth thumb drives and speaking with AD and ND about their observations, Ofc. Zammit took all five thumb drives back to the police station and viewed the contents along with Fort Myers Police Officer Sgt. Doro. (Doc. #61, pp. 169-170). Ofc. Zammit testified he saw child pornography on all five thumb drives. (Doc. #61, p. 170). Ofc. Zammit acknowledged he did not have a warrant nor did he have Harling's permission to open the thumb drives and view the contents.

The warrantless views of the fourth and fifth thumb drives were *per se* a violation of the Fourth Amendment. Pursuant to the independent source doctrine, however, evidence initially obtained by an illegal search or seizure may later be used by the government if the government can show that the evidence would have been ultimately obtained independently of the initial illegality and in compliance of the Fourth Amendment. Doe v. United States, 896 F. Supp. 2d 1184, 1188-89 (S.D. Fla. 2012) (citing Murray v. United States, 487 U.S. 533, 541-42, 108 S. Ct. 2529, 101 L. Ed. 2d 472 (1988)). In other words, "[s]o long as a later, lawful seizure is genuinely independent of an earlier tainted one (which may be difficult to establish where the seized goods are kept in the police's possession) there is no reason why" the government should not be able to use the evidence previously obtained. Id. at 542. To prohibit the government from using evidence

"the police ultimately obtained by independent legal means would not put the police in the same position they would have been in if they had not committed any illegal conduct; instead, it would put them in a worse position." Doe, 896 F. Supp. 2d at 1189 (citing United States v. Markling, 7 F.3d 1309, 1315 (7th Cir. 1993)).

One circumstance where courts have held the government may use evidence initially discovered during an illegal search or seizure is where agents subsequently obtain the evidence pursuant to a valid search warrant based on information independent of the initial tainted search or seizure. Murray, 487 U.S. at 541-43. In such a situation, the "ultimate question . . . is whether the search pursuant to the warrant was in fact a genuinely independent source of the information and tangible evidence at issue." Id. at 542.

After reviewing the fourth and fifth thumb drives, Ofc. Zammit and Sgt. Doro turned the drives over to Det. Meeks.  Det. Meeks obtained a warrant for all five USB thumb drives. (Doc. #62, p. 242) (Gov't. Ex. 8A).  Harling argues the warrants are invalid because they contain information gathered from Ofc. Zammit and Det. Doro's illegal search as well as false information from Det. Meeks, AD and ND.

Det. Meeks testified the affidavit he used to obtain the search warrant included the information provided by AD and ND, i.e., they had seen graphic images of child pornography on two of the USB thumb drives.  The affidavit also included observations and information Det. Meeks learned from Ofc. Zammit's report regarding Ofc. Zammit's view of the thumb drives and Det. Meeks' forensic preview. (Doc. #62, pp. 244-245); (Gov't Ex. 8A).

The description of the images viewed by AD and ND alone provided a fair probability that contraband or evidence of a crime would be found on all five USB thumb drives as they were found hidden in the same location, on the same day, July 4, 2013. The private search conducted by AD and ND provided the issuing court an independent source for the necessary probable cause to issue a search warrant for all five USB thumb drives.

For that reason, the Government can show the evidence would have been ultimately obtained independent of any alleged initial taint and in compliance with the Fourth Amendment without Ofc. Zammit, Sgt. Doro or Det. Meeks allegedly tainted views of the thumb drives. As such, the independent source doctrine applies to this case and the fourth and fifth USB thumb drives will not be suppressed.

(3) Validity of the Search Warrant Affidavits

Harling attacks not only the validity of the search warrants for the five USB thumb drives, but also the subsequent search warrants for his Cape Coral residence. Two search warrants were issued for Harling's Cape Coral residence. The initial search warrant was for computer-based evidence. The second, broader in scope, was for evidence relating to furniture, bedding and household décor property that appeared to match items visible in the background of the photos contained on the USB thumb drives.

Harling argues the affidavits of Det. Meeks were invalid because Det. Meeks used false or misleading information in the affidavits presented to the state court judge. Specifically, Harling argues Det. Meeks added false information in the affidavit for all three search warrants by stating AD and ND found child pornography on the first three USB

thumb drives, and included information from his warrantless forensic examinations of all five thumb drives.

What the Fourth Amendment requires of a search warrant application is that it enables the issuing judge

> simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and the 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'

United States v. Jiminez, 224 F.3d 1243, 1248 (11th Cir. 2000) (quoting Illinois v. Gates, 462 U.S. 213, 238, 103 S. Ct. 2317, 2332, 76 L.Ed.2d 527 (1983)). In this regard, "'probable cause is a fluid concept-turning on the assessment of probabilities in particular factual contexts[.]'" United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999) (quoting Gates, 462 U.S. at 232). For this reason,

> [c]ourts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determination.

United States v. Miller, 24 F.3d 1357, 1361 (11th Cir. 1994) (citing Gates, 462 U.S. at 236–37, 103 S. Ct. at 2331-32; United States v. Ventresca, 380 U.S. 102, 109, 85 S. Ct. 741, 746, 13 L. Ed.2d 684 (1965)). In reviewing the issuance of the search warrant, the undersigned must determine whether there was a "substantial basis" for concluding that probable cause existed to uphold the warrant. See Gates, 462 U.S. at 238, 103 S. Ct. at 2331; see also Massachusetts v. Upton, 466 U.S. 727, 728, 104 S. Ct. 2085, 2085, 80 L.Ed.2d 721 (1984) (per curiam).

For the following reasons, the Court finds the inclusion of the alleged erroneous information in the USB thumb drive affidavit by Det. Meeks does not support the exclusion of the evidence found pursuant to the thumb drive warrant.  As noted above, Det. Meeks testified the affidavit he used to obtain the search warrant from the state court judge included the information provided by AD and ND, that they had seen graphic images of child pornography on two of the USB thumb drives.  The affidavit also included observations and information Det. Meeks learned from Ofc. Zammit's report and warrantless viewing of the drives and Det. Meeks' forensic preview. (Doc. #62, pp. 244-45); (Gov't Ex. 8A).

The Court has determined the information provided by AD and ND was sufficient to give the issuing judge a fair probability that contraband or evidence of a crime would be found on all five USB thumb drives.  Thus, any other information included in the affidavit for the search warrant that may have been incorrect or tainted by a warrantless view would be harmless error.  See United States v. Durdley, No. 1:09-cr-00031-MP-AK, 2010 WL 916107, at *8 (N.D. Fla. Mar. 11, 2010).

Harling also contests the search warrants for his Cape Coral residence.  The initial search warrant for his Cape Coral residence was issued on July 12, 2013.  The initial residential search warrant also contained information from Det. Meeks' affidavit used to obtain the search warrant for the USB thumb drives.  Harling objects that the warrant is the "fruit of the poisonous tree" because it was based on the allegedly illegal affidavit originally written by Det. Meeks.  As noted above, the affidavit for the USB thumb drives was supported by an independent source—AD and ND's private search of the first two

thumb drives—and as such, any taint contained in the affidavit would not be cause to suppress the initial search warrant for Harling's residence.

In addition to the thumb drive information, the initial residential search warrant also contained a section on the characteristics of child pornography collectors and computer evidence. Spec. Agt. Wagner stated in his affidavit the following:

> Based upon your affiant's knowledge, experience, and training in child exploitation and child pornography investigations, there are certain characteristics common to many individuals involved in the receipt of and collection of child pornography. In the past, collectors of child pornography often possessed and maintained "hard copies" of child pornographic material such as pictures, films, video, tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their own home or some other secure location. Child pornography collectors typically retained pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, mailing lists, child erotica, and video tapes for many years. With the advent of technology, that is safe, secure and private, such as a computer and/or back-up storage discs or other forms of data storage devices. Child pornography collectors also may correspond with and/or meet others to share information and materials, rarely destroy correspondence from other child pornography distributors/collectors, conceal such correspondence as they do their sexually explicit material, and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography. Collectors of child pornography prefer not to be without their child pornography for any prolonged time period. This behavior had been documented by law enforcement officers in the investigation of child pornography throughout the world.

(Gov't. Ex. 15a). This information contributes to the issuing judge's probable cause determination regarding Harling's Cape Coral residence. As the affidavit was supported by an independent source, any taint contained in the affidavit would not be cause to suppress the initial search warrant for Harling's residence.

Defendant Harling also challenges the second residential search warrant as the fruit of the poisonous tree. Spec. Agt. Wagner asked for a second search warrant for Harling's Cape Coral residence as a result of viewing items during the execution of the

16

initial search warrant that matched items in the background of the photos and videos on the USB thumb drives. As initial search warrant for the Cape Coral residence was restricted to computer and paper evidence related to child pornography, the officers did not go beyond the scope of that warrant to retrieve the items that appeared to be consistent with those viewed in the photographs on the thumb drives. Rather, Spec. Agt. Wagner sought and was granted the second broader search warrant for the Cape Coral residence relying on the evidence provided by the private search of AD and ND contained within the affidavit of Det. Meeks. Harling's objection is overruled to the second residential search warrant.

Finally, Harling argues any statements made by himself, his son, and any identifications made by his son during the search of his Cape Coral residence should be suppressed as the fruit of the poisonous tree. As to the Defendant's statements, and as noted by the Magistrate Judge, Harling was not under arrest at the time the statements were made, he was free to leave or end the interview, which he ultimately did, and he chose to make identifications or statements after he was read his <u>Miranda</u> warnings. The Court finds the Defendant's statements were freely and voluntarily made. The objection is overruled. As to the identifications and statements made by the Defendant's son, the Court finds Defendant has established no basis for requesting his statements be suppressed nor does the Court find any reason to do so.

## **CONCLUSION**

The decision of the Magistrate Judge is affirmed and Defendant Brian Harling's Objections are overruled.

Accordingly, it is now

17

initial search warrant that matched items in the background of the photos and videos on the USB thumb drives. As initial search warrant for the Cape Coral residence was restricted to computer and paper evidence related to child pornography, the officers did not go beyond the scope of that warrant to retrieve the items that appeared to be consistent with those viewed in the photographs on the thumb drives. Rather, Spec. Agt. Wagner sought and was granted the second broader search warrant for the Cape Coral residence relying on the evidence provided by the private search of AD and ND contained within the affidavit of Det. Meeks. Harling's objection is overruled to the second residential search warrant.

Finally, Harling argues any statements made by himself, his son, and any identifications made by his son during the search of his Cape Coral residence should be suppressed as the fruit of the poisonous tree. As to the Defendant's statements, and as noted by the Magistrate Judge, Harling was not under arrest at the time the statements were made, he was free to leave or end the interview, which he ultimately did, and he chose to make identifications or statements after he was read his <u>Miranda</u> warnings. The Court finds the Defendant's statements were freely and voluntarily made. The objection is overruled. As to the identifications and statements made by the Defendant's son, the Court finds Defendant has established no basis for requesting his statements be suppressed nor does the Court find any reason to do so.

## **CONCLUSION**

The decision of the Magistrate Judge is affirmed and Defendant Brian Harling's Objections are overruled.

Accordingly, it is now

**ORDERED:**

(1) The Magistrate Judge's Report and Recommendation (Doc. #74) is **ADOPTED** to the extent set forth and modified herein.

(2) Defendant Harling's Objections are **OVERRULED.**

(3) Defendant Harling's Motion to Suppress (Doc. #29) is **DENIED**.

**DONE AND ORDERED** at Fort Myers, Florida, this 4th day of August 2014.

*Sheri Polster Chappell*
SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies:  Counsel of Record